UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EAMMA SAFI,<br><br>a/k/a "TT,"<br><br>a/k/a "Yummy,"<br><br>Defendant | 24-cr-10200-RGS-JCB-2 |

**MEMORANDUM OF THE UNITED STATES IN SUPPORT OF DETENTION**

The United States of America respectfully submits this memorandum in support of its motion to detain Defendant Eamma Safi pursuant to 18 U.S.C. §§ 3142(f)(2)(A) and 3142(f)(2)(B).[1]

There is nothing to keep this defendant in the United States to face the prospect of a decade or more in prison. He is a 39-year-old German citizen who lives in Germany and the United Arab Emirates—both countries that would not extradite him against his will. He has no ties to the United States: no family, no property, and no ability to obtain lawful employment here. Conversely, he has extensive ties abroad. He not only lives abroad, but has family that lives there with him, including his wife, children, and parents. He also travels abroad extensively, including to

[1] On February 27, 2025, at the initial appearance and arraignment, the government moved to detain the defendant pursuant to § 3142(f)(2)(A). [Dkt. No. 18.] Since then, the government has learned that the defendant violated the Court's Protective Order by, among other things, communicating with co-defendants and identifying cooperating witness, which is discussed below. In light of the newly acquired information, the government respectfully requests expanding the bases for detention to include § 3142(f)(2)(B). *See United States v. Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir. 1985) ("[W]here the court finds that a defendant's release creates an unusual risk of obstruction of justice, the Constitution and relevant statutes permit detention.").

perpetrate the international securities fraud and money laundering scheme that is the subject of this case, and has assets abroad.

Only detention could ensure this defendant's appearance at trial. As outlined in detail in the 67-page Indictment and 97-page Complaint,[2] the defendant is well-versed in evading law enforcement. For nearly a decade, he worked to conceal his securities fraud and money laundering scheme by communicating about it only in person or over disposable cell phones, by using encrypted messaging applications like Signal and Telegram with auto-deleting messages, and by speaking in code. When the defendant finally was arrested in Switzerland last summer, he had with him three different cell phones, over a dozen international bank cards, and approximately €16,000 in cash. In the eight months since his arrest, the defendant has vigorously opposed his extradition to face justice in the United States. Here now against his will, he faces serious charges, strong evidence, and a Guidelines sentencing range that could send him to prison for more than 20 years. There is no reason to think that in such circumstances, the defendant suddenly will abandon his years-long pattern of subterfuge and comply with conditions of pretrial release.

The defendant's lack of ties to this District, his wealth, his strong international network, the nature and seriousness of his offense, the strength of the government's case against him, and his own actions since being detained all combine to create a serious risk that this defendant will flee the United States, not appear for trial, and return to one of the two countries where he resides, neither of which would then extradite him. In addition, the defendant disregarded the Court's Protective Order repeatedly. There is no condition or combination of conditions that reasonably

[2] The Complaint and Indictment focus on the defendant and co-defendant ZHI GE, also known as "Josh Ge." GE was arrested and detained in Singapore, where is contesting extradition to the United States. The grand jury has since returned a Superseding Indictment, which added defendants who have not been apprehended. [Dkt. No. 43.]

could assure the defendant's appearance or prevent obstruction of justice, and the Court should detain him pending trial. *See* 18 U.S.C. § 3142(e)(1).

## I. **Background**

The original Indictment charges the defendant and ZHI GE, also known as "Josh Ge," for their roles in an expansive insider trading and money laundering scheme. [Indictment, Docket No. 6, hereinafter ("Ind.").] Specifically, from at least November 2016 through February 2024, the defendant conspired with others known and unknown to obtain material non-public information ("MNPI") about the financial performance and merger-and-acquisition activity of numerous publicly traded companies in advance of the public announcements of that news. [*Id.* at ⁋ 39.] The defendant and others obtained that MNPI from, among other sources, company insiders who were participants in the scheme. [*Id.* at ⁋ 41.] Armed with the MNPI before it was disclosed to the public, the defendant and his co-conspirators traded on the basis of it in brokerage accounts held in their own names and provided the MNPI to other co-conspirator traders in exchange for a percentage of their trading profits. [*See, e.g.*, *id.* at ⁋⁋ 66-69, 84-154.] The defendant and others also conspired to leak the MNPI to journalists to further capitalize on their trading. [*Id.* at ⁋⁋ 41, 137-145.]

## II. **The Defendant Has No Ties to the District of Massachusetts.**

The government is not aware of any ties that the defendant has to the District of Massachusetts. The defendant lives abroad and his wife, children, and all of his known family and friends do too. The defendant has traveled extensively abroad; the government counted over 70 stamps on his passport, including travel to Belarus, where his wife is from and which is beyond U.S. extradition. *See* Ex. 1(defendant's passport). He has no one here who could serve as a third-party custodian; no employment that he could be ordered to seek or maintain; and no permanent

residence to which he could be ordered confined. The defendant's only existing ties are to countries that will not extradite him at all (U.A.E.) or without his consent (Germany), which further favors detention. *See United States v. Shuklin*, 2020 WL 2992522, at *1 (6th Cir. Mar. 18, 2020) (affirming detention of a United States resident, based in part on his "strong ties overseas including [in] Russia, which does not provide for extradition"); *United States v. Kachkar*, 701 F. App'x 744, 747 (11th Cir. 2017) (affirming detention of a United States resident who had traveled extensively to Russia and Libya, "countries for which the United States does not have an extradition treaty"); *United States v. Fishenko*, 2013 WL 3934174, *3 (E.D.N.Y. Jul. 30, 2013) (affirming detention of a dual citizen of Russia and the United States: "The United States does not have an extradition treaty with Russia. Therefore, were Fishenko to flee, he could not be compelled to return to the United States.").

Even if the defendant could obtain a residence here on a temporary basis, that would be small comfort given the significant countervailing family, community, and financial ties that the defendant maintains abroad. The defendant has no ties to this community that predate his arrival here in FBI custody, and any that he could buy (or rent) would be so ephemeral as to be meaningless to the question of detention.

Recent precedent confirms that detention is warranted in these circumstances. In *United States v. Klyushin*, United States Magistrate Judge Marianne Bowler detained a Russian citizen with no ties to the United States. 21-cr-10104-PBS, Dkt. No. 34. The defendant was a person of considerable means and proposed release with conditions that included (1) a $2.5 million bond, secured by the defendant's properties in Russia and the United Kingdom; (2) home detention with electronic monitoring; (3) agreement not to acquire a new passport; (4) daily contact with Pretrial Services; (5) residence in a rental apartment without access to the internet and certain telephonic

communications; and (6) supervision by private guards hired at the defendant's expense. *Id.* at 4. Judge Bowler declined this package, explaining that "[w]hile the defendant has proposed a myriad of conditions, this court is not convinced that a defendant, who is an individual well versed in sophisticated financial matters, has access substantial financial resources and absolutely no ties to this country, will appear as required. He has absolutely no incentive to remain in this country." *Id.* She also noted that the defendant "appears to have substantial financial means and the degree of sophistication needed to facilitate clandestine flight," and that a "lack of official travel documents has not been a deterrent to flight by other foreign nationals who have appeared before this court. *Id.* United States District Judge Patti B. Saris affirmed this decision on appeal. 21-cr-10104-PBS, Dkt. No. 64.

## III. <u>The Defendant Has the Means to Flee.</u>

Through the above-described scheme, the defendant and his co-conspirators have made tens of millions of dollars in illegal profits, which they laundered through, among other things, cash payments and international financial transactions undertaken to conceal the sources of the proceeds, mask the identities of the scheme's participants, and promote the illicit trading. The government estimates that the defendant personally made at least $5 million in profits from the scheme, including approximately $3.1 million in profits on his trading in Tiffany securities, approximately $560,000 in profits on his trading in Wright Medical securities, and approximately $520,000 in profits on his trading in Walgreens securities. To date, the government has not seized any of the defendant's trading profits. Therefore, there is good reason to believe that the defendant and his co-conspirators have stored these profits around the world and in countries beyond the United States's reach. Consider, for example, the collection of 13 bank cards in the defendant's name that the defendant happened to have with him at the time of his arrest (in addition to

approximately €16,000 in cash). These cards appear to be associated with 13 different international bank accounts (12 Emirati and 1 German): These include three accounts at the Commercial Bank of Dubai, two accounts at RAKBANK, one account at Nomo Bank, 2 accounts with Mashreq Al Islami NEO, 1 account at Kreissparkasse Muenchen Starnberg Ebersberg, 2 accounts with Abu Dhabi Islamic Bank, and 2 accounts with WIO bank. *See* Ex. 2. The government is also aware of at least one account in Switzerland. The United States has little visibility into these accounts at present, but they are 13 places where the defendant may have hidden the proceeds from this scheme, which funds he could use to flee.

## IV. <u>The Weight of the Evidence Against the Defendant Is Substantial.</u>

The defendant was a leader in the scheme, and the evidence against him is substantial. Among other things, and as alleged in the Indictment, the defendant himself obtained MNPI from an individual identified as CC-1 and other insiders, including by paying for it [see Compl. Aff., Dkt. No. 1-1, hereinafter "Compl.", at ¶ 65]; traded on the MNPI in brokerage accounts his own name [*e.g.*, Ind. at ⁋⁋ 66, 68, 85, 87, 124, 128, 133, 146]; recruited co-conspirators like GE to expand the scheme's scope and profitability [*id.* at 43-49, 51-54, 56, 58-59]; tipped co-conspirator traders whose role in the scheme was to trade on the MNPI in exchange for 50 percent of the profits being kicked-back to the defendant, GE, and others [*see, e.g.*, *id.* at ⁋⁋ 82-93]; directed co-conspirator traders how to launder the proceeds of the illicit trading [*id.* at ⁋⁋ 93, 161, 170-71]; and leaked MNPI to financial journalists and news outlets to profit on securities trades following the publication of that information [*id.* at ⁋⁋ 137-145]. This conduct is well-documented in bank records capturing the defendant's trading activity in parallel with his co-conspirators and in abundant electronic communications capturing the defendant's self-incriminating statements.

For example, beginning in or around November 2016, the defendant and an individual identified as CC-1 recruited GE to the insider trading scheme. [Ind. ⁋ 43.] On or about November 17, 2016, the defendant sent a Facebook message to GE: "Since [CC-1] wants to see you this Friday. Plan would be lunch and in the evening drinks."[3] [*Id.* at ⁋ 43.] Later, on or about the same day, the defendant sent another message to GE: "Friday you will be welcomed to our world of business." [*Id.*] On or about November 19, 2016, GE met with CC-1 and the defendant at a restaurant that the defendant owned with CC-1, and in which CC-2 was an investor. [*Id.* at ⁋ 44.] Later, on or about the same day, GE and the defendant exchanged the following coded messages, in which they used the terms "socks" and "shoes" to refer to SIM cards and cellular phones, the term "greens" to refer to money, and the term "running" to refer to insider trading:

| | |
|---|---|
| SAFI: | Hi bro |
| SAFI: | Just arrived home |
| GE: | All good |
| SAFI: | Did you get the shoes with the socks? |
| GE: | Yeah |
| GE: | 1 shoe |
| GE: | I didn't get my greens tho hahahahhaah? |
| GE: | But its all cool our friend and I have an understanding |
| SAFI: | Is that shoe good for running? |
| SAFI: | Can you run against 5-8 guys with it? |
| SAFI: | The greens you will pick up next time you come before the Trop |

[3] Unless otherwise noted, all capitalization, typographical, and spelling errors herein are set forth as they appear in the original messages.

| | |
|---|---|
| SAFI: | Trip |
| SAFI: | But we have a [clapping hands emoji] on that |
| GE: | OK |
| GE: | Yeah can run |

[*Id.* at 45.] Following that conversation, GE began to recruit additional traders to the scheme, and to provide others with MNPI from the defendant about the planned acquisition of Banvit S.A., a Turkish poultry-processing company that traded on the Istanbul Stock Exchange, by BRF S.A. ("BRFS"), a Brazilian food-processing company. [*Id.* at ⁋ 46.] The deal was not publicly announced until in or about January 2017. [*Id.*] On or about November 20, 2016, approximately one day after GE's meeting at the restaurant with the defendant and CC-1, GE reported on his progress recruiting other co-conspirators to the scheme to the defendant in the following coded exchange:

| | |
|---|---|
| GE: | Already raced against one guy he's happy with the way I run |
| SAFI: | Wow |
| SAFI: | Business business business |
| GE: | Eamma [CC-11] insists on whatsapp lol |
| GE: | Haven't told him shit |
| GE: | He's calling me now |
| GE: | Just ran with the black guy looks good just 3-4 more guys to go |
| SAFI: | Wow |
| SAFI: | Sounds awesome |
| GE: | This shit is easier than I thought |

| | |
|---|---|
| GE: | Everyone knows what's up lol |
| SAFI: | I told you |
| SAFI: | Everybody will start sucking your d*** |
| GE: | I thought peeps are gonna be more apprehensive |
| SAFI: | No |

[*Id.* at ⁋ 48.] In the days and weeks that followed, the defendant and GE exchanged numerous additional messages about techniques to keep the scheme a secret and the recruitment of additional traders. [*Id.* at ⁋⁋ 49, 51-54, 56, 58-59] The defendant promised GE, "Millions are like 12-15 months away in worst case | 100s of k | Just few months." [*Id.* at ⁋ 54.]

The defendant also directly helped to recruit the primarily U.S.-based trader Ronald Cordas to the scheme, including by providing Cordas with MNPI regarding the potential acquisitions of Kindred and Pinnacle, in order to encourage Cordas to join the scheme and to share his future insider trading profits with the defendant, GE, CC-1, and other co-conspirators. [Ind. at ⁋ 64.] For example, on or about March 9, 2017, GE and the defendant exchanged a message exchange in which GE described Cordas as a "close friend[]" who was "worth about 10 mil" and had "an apartment in Czech . . . so we can meet around Poland. [*Id.* at ⁋ 65.] On or about April 18, 2017, the defendant began to purchase shares of Kindred. [*Id. at* ⁋ 66.] On or about April 26, 2017, GE reminded Cordas that he would not need to kick back a share of the illicit trading profits he generated from the initial "samples" of MNPI GE had by then provided about the forthcoming Kindred and Pinnacle mergers, telling Cordas: "btw its free you know that right," and "you don't need to pay us a cent for the first ones." [*Id.* at⁋ 67 On or about May 15, 2017, the defendant also began to purchase shares of Pinnacle. [*Id.* at ⁋ 68.] On or about May 31, 2017, Cordas began

purchasing Pinnacle and Kindred call options.[4] [*Id.* at ¶ 69.] On or about June 1, 2017, after the Reuters news service reported that Conagra Brands had approached Pinnacle to express interest in acquiring the company, GE and Cordas exchanged coded messages, in which they referred to the increase in Pinnacle's stock price after the news was announced as a "party" and the stocks they traded as "girlfriends", and in which GE reminded Cordas that he would eventually need to kick back a share of his illicit profits from future deals as a "cover charge." [*Id.* at ¶ 71.] Later in 2017, the defendant also met with Cordas in person at the defendant's Paris, France restaurant to discuss Cordas's participation in the insider trading scheme. [Ind. at ¶¶ 76-77, 81-82.] From that time forward, over a period of approximately three years, Cordas traded in advance of a dozen announcements based on MNPI from the defendant and GE (including Pinnacle and Kindred) about forthcoming transactions and news announcements—often in parallel with the defendant. [*Id.* at ¶¶ 84-85, 87-89, 91-92, 95, 99, 111, 119-128, 131.]

Finally, as referenced above, the defendant himself directed Cordas regarding kickback payments of his illegal trading proceeds and on at least one occasion personally met Cordas to collect such a payment. On or about August 13, 2018, at the defendant's direction, Cordas met with the defendant in Vienna, Austria, and handed him 100,000 Euros in cash. [Ind. at ¶¶ 93, 161.] And on or about April 1, 2020, the defendant and GE directed Cordas to send a $300,000 wire to an account in the name of Individual 7. [*Id.* at ¶ 170.] At GE's instruction, Cordas falsely advised the bank that the purpose of the transfer was to acquire personal goods. [*Id.*]

[4] Call options are a type of security that give the buyer the right to buy a stock at a specified price—known as the "strike price"—within a specified timeframe. Call options provide a way of profiting from the near-term appreciation of a stock's price, but such options are worthless if the stock's price does not appreciate beyond the strike price, by at least the cost of the option, by the time the option expires.

## V. **The Nature of the Offense and the Defendant's Actions Since Detained Cast Doubt on His Prospective Compliance with Pretrial Supervision and Threaten Obstruction of Justice.**

The defendant is sophisticated and well versed in evading legal restrictions, such that the Court can have no confidence that he would comply with any conditions of pretrial release imposed here. For example, numerous of the above-described messages involved the use of encrypted messaging applications like Telegram, and heightened security features like time-automated deletion. [Ind. ⁋⁋ 73, 97-98, 101, 104, 114, 131-51, 172.] The defendant and his co-conspirators used rotating "burner" phones and SIM cards, as referenced in the "shoes" and "socks" exchanges above. [*Id.* at ⁋⁋ 41, 45, 51, 157.] And the defendant directed his co-conspirators to meet him in person to learn specifics of the scheme, and to provide him with the kickbacks they owed from their trading on the basis of MNPI he provided. [*Id.* at ⁋⁋ 76-77, 81-82, 93, 161.] He cautioned co-conspirators against generating records; for example, he directed a co-conspirator not to take a train to prevent a record of the ticker. [Compl. at ¶ 116.] He warned others about involving Americans because he was concerned about attracting law enforcement attention. [*Id.* at ⁋ 68.] These tactics worked; for many years, the defendant evaded authorities. There is no reason to think the defendant now will change his ways and not use these or similar tactics to evade any conditions the Court may impose.

In addition, the defendant has engaged in a campaign from Wyatt to identify cooperating witnesses, pass messages about the case to co-defendants and co-conspirators, and even communicate directly with fugitive co-defendants about the case. These actions create a risk to cooperating witnesses, make it harder for the government to apprehend fugitive defendants, violate

the Court's Protective Order's requirement not to disclose discovery materials, and generally obstruct justice. [Dkt. No. 27, ¶ 2.] Specifically,[5]

- On March 11, 2025, the defendant told his wife to tell the wife of co-defendant GE "we want to stay strong please…. Cuz I am strong now." In other words, the defendant was passing a message to GE not to cooperate.
- On March 19, 2025, he identified a cooperating witness.[6]
- On April 27, 2025, the defendant spoke directly with co-defendant SAMY KHOUADJA, who remains a fugitive about the case.[7] A screenshot follows, with SAFI on the left and KHOUADJA on the right.




- On May 12, 2025, he discussed with his wife what a cooperating witness said.
- Also on May 12, 2025, the defendant told his wife what she should say to the wife of co-defendant GE about the case.

[5] The descriptions of these communications are from initial draft transcripts by the government, which include translations in some cases.
[6] This communication took place five days before the Court entered the Protective Order.
[7] KHOUADJA had not yet been charged as of the date of this call.

- On August 20, 2025, the defendant asked his wife if she had heard from GE's wife, which was a request for information from GE.
- On September 9, 2025, the defendant's wife read to the defendant a message from an unidentified source, which contained the following:

> "Please furnish with more detail if you want me to think more. Tell him I wish him the best, but I think that you should focus on the guy who introduced CW-1, who I have never ever met, instead of chasing random stuff."

- On September 12, 2025, the defendant's wife read to him a message from GE and wrote down a message to GE from the defendant. The defendant's message asked GE to

> "maybe try to understand who are his business associates in his company? And how their social media profiles are linked to the Taiwanese Chris? I have hints about confidential sources in my and [my wife's] friend circle."

The fact that the defendant repeatedly violated the Court's Protective Order, *while detained*, demonstrates that he would not follow any terms of pretrial release set by the Court. In addition, any release would heighten the risk that the defendant would obstruct justice, a risk which is heightened where there are six co-defendants already abroad and evading arrest. *See United States v. Teixeira*, Cr. No. 23-10159-IT, 2023 WL 5672758 at *8 (D. Mass. Sept. 1, 2023), *citing United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) ("the pretrial release system depends, in part, on a court's belief that defendants will keep their word"); *United States v. Garcia-Oquendo*, Cr. No. 25-041 (SCC), 2025 WL 756456 at *4 (D. P.R. Mar. 10, 2025) (court took into consideration that "defendant has repeatedly failed to obey the orders of the Court").

## VI. <u>The Defendant Faces a Substantial Term of Imprisonment Upon Conviction.</u>

Though the investigation is ongoing, the government's current estimate of the defendant's exposure at a sentencing upon conviction in this case is that the defendant would face a possible sentence of over 10 years in prison. Based on a conservative Sentencing Guidelines analysis, the

defendant was a leader and organizer of the insider trading scheme, which generated over 9.5 million in profits (the defendant himself made over $5 million) and then laundered, the defendant's total offense level would be 34, resulting in a guidelines sentencing range ("GSR") of 151 to 188 months, equal to over 12 years:

| **U.S.S.G. Provisions** | | **Offense Level** | **GSR** |
|---|---|---|---|
| Base Offense Level for Insider Trading | Section 2B1.4(a) | 8 | |
| Gain Amount Over $9.5 million | Section 2B1.1(b)(1)(K)[8] | 20 | |
| Conviction Under Section 1956 | Section 2S1.1(b)(2)(B) | 2 | |
| Aggravating Role – Leader | Section 3B1.1(a) | 4 | |
| Total Offense Level | | 34 | 151-188 months |

On top of that, the defendant would owe millions in restitution, forfeiture, and fines.

Moreover, recent precedent in this District shows that a sentence in this ballpark is not a hypothetical. In *United States v. Klyushin*, discussed above, Judge Saris determined that the defendant's total offense level was 32, which equated to a GSR of 121 to 151 months because the defendant had no criminal history. *See* 21-cr-10104-PBS, Dkt. No. 261. Judge Saris varied downward to impose a sentence of 108 months, based in large part on circumstances not present here, such as the harsh conditions in American prisons during the COVID-19 pandemic and the defendant's lack of facility with the English language. *Id.* Even assuming the defendant here received a comparable downward variance from the low end of his guidelines, he still would receive a sentence in excess of a decade. This fact favors detention. *See, e.g.*, *United States v. Castiello*, 878 F.2d 554, 556 (1st Cir. 1989) (significant "potential sentence" provided "strong

[8] Under the proposed inflation amendments to the Guidelines, this amount of gain would be 18 levels, not 20. The resulting GSR would be 121 to 151 months.

inducement to flight"); *United States v. Mateo Soto*, No. 16-10350-RGS, 2017 WL 5178781, at *2 (D. Mass. Nov. 8, 2017) (ordering detention despite the defendant's "family and business ties in Massachusetts" due to potential "substantial jail sentence").

## VII. <u>The Defendant's Opposition to Extradition Further Favors Detention</u>

Finally, it is worth noting that not only does this defendant lack ties to this district (and country), but also that he is here both against his will and despite his best efforts. The defendant was arrested in Switzerland in late-June 2024 and fought the United States's extradition request there for the 8 months since. That included at least two appeals from the decision of the Swiss Ministry of Justice ordering his extradition, first to the Swiss Federal Criminal Court and then to the Swiss Federal Tribunal, that country's highest court. Notably, Swiss authorities felt it necessary to seek and secure the defendant's detention during his extradition proceedings. While the defendant clearly was entitled to oppose extradition, the fact that he is in Massachusetts against his will is relevant to the Court's analysis of his willingness to remain here during the pendency of this case.

## <u>CONCLUSION</u>

The picture painted above is of a defendant who must be detained. There is no condition or combination of conditions that could keep this defendant—who has no ties to this district and both the means and significant motives to flee from it—from absconding to one of the multiple

countries where he already has an established residence and will be safe from extradition. The government respectfully requests that the Court detain the defendant pending trial.

Respectfully submitted,

LEAH B. FOLEY
Acting United States Attorney

By: /s/ *Timothy E. Moran*
TIMOTHY E. MORAN
Assistant United States Attorney
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ *Timothy E. Moran*
TIMOTHY E. MORAN
Assistant United States Attorney